Good morning, folks. It's still morning. Mr. Martellotti, are you ready to proceed? I am, Your Honor. Thank you very much. Good morning. I would respectfully request two minutes for rebuttal. Okay. May it please the Court, my name is Jerry Martellotti. I represent Sandra Clowney in this matter that is before the panel today. Getting a tremendous amount of feedback is I'm getting a little bit. I can hear you fine, but there's a tiny bit of reverberation in there. Okay, I'll keep going then. This matter before the panel today involves a hybrid 301 action under the Labor Management Relations Act. And for purposes of today's argument, we'll be focusing specifically on the issues regarding representation and duty of fair representation of the union. Ms. Clowney was a member of the International Machinists and Aerospace Workers Union and was working at the URS facility in Tobyhanna, Pennsylvania. During the course of her work there, there was a company-wide layoff that impacted her. She was previously worked both as an equipment cleaner and as an electrical tech too while she was at the Tobyhanna facility. Prior to the layoff, the facility requested that the workers fill out two forms. One form was to indicate what their job history was besides the jobs that they held in their current positions. And she filled that document out indicating that she both worked as an equipment cleaner and as electrical tech too. Another form was also indicating whether the person would take a voluntary layoff or if the person wanted to use her seniority to bump into other work, either in the same job classification or the job classification that they had seniority in. This document was filled out and she indicated that she did want to work for her in her job. I'm sorry, did or did not? Did, did want to work. The layoffs did occur and as an ET3, Ms. Clowney did not have enough seniority to hold the position so she was in the process of the layoff. She sat for a cable test which was required of any individuals that she failed the test and as a result was laid off. Unfortunately, equipment cleaner jobs that she did have seniority to hold and were open at the time of the layoffs were not made available to her. This starts the dispute of facts that really becomes the major issues that spring from this specifically indicated she wanted to bump and she specifically indicated that she had worked as an equipment cleaner. When the jobs, when she was laid off, she had enough seniority to hold a job as an equipment cleaner and that job was not offered to her. In terms of, that was not offered to her. I'm sorry, no, the job was not offered to her at the time of the layoff. The reason it was not offered to her, it remains unclear. Now, the position that was taken during the litigation is that there was some other affirmative act that she was required to take. Judge Porter just asked whether or not she applied to it. I think that's part of the dispute. Did she apply for the equipment cleaner position as she was encouraged to do in the termination memo? No, she did not apply for that position. However, if the court is familiar with the brought back from one classification to the other without applying, they were randomly called and brought back. In terms of what she did- Were they randomly called or was it based on seniority? It was based on seniority, correct. They were out of work and were brought back, not because they applied for work or went to the website, they were brought back to work. The internal operations required that they go to this master list that was in place and available to all the parties to look for seniority. In terms of the ET2 position, she failed the test that was required in the ET2 job. This test was a test that was unilaterally put into place by URS during the course of the contract after the collective bargaining agreement was in place. Now, having said that, she was moving from an ET3 to an ET2, so making her take the test was within the rules of the collective bargaining agreement. However, because the test was in place and because the test displaced other ET2 members into the workplace, this test impacted her and her seniority. Now, she has two hurdles to overcome. One, she's not been given an opportunity to work in the jobs that she had seniority for the equipment cleaner position. Two, the ET2 job, the only one that she has seniority to hold is in this cable shop that requires a test. This test being put in place by URS has now displaced her into the workplace and has not allowed her to use her seniority in a way that she would have been. Your strongest argument, though, there, in terms of summary judgment, is the fact that Keith Labate, apparently, was also displaced as an ET3, took the test and for an ET2, failed the test for an ET2, but he was not given the same, but Connie was not given the same. That's part of it, certainly. Michael Fink, who we did not get an affidavit from, also fits into that category as a three who failed the test and was brought back as a two. Again, Ms. Clowney had more seniority than him as a two when he was brought back. Did she ever say she wanted to be brought back? Yes, she did. She said she wanted to be brought back. She actually called the plant manager on a few occasions looking for work. She called her union saying that she heard other people were being brought back to work. They told her that they would look into it and they didn't get back to her. Now, after a course of two years, she loses her seniority. Unfortunately, that happened. She was out of work for more than two years. She kept trying to come back and then she was hired back by URS as a painter helper after the two-year period of time. One of the issues that becomes problematic is once she's brought back to work now, she finds out about two things. She finds out about the individuals that were brought back to work before her with less seniority and that they both had lost wages and seniority reinstated where she did not. That begins the grievance process in this matter. When she files the grievance process, that also is a major part of this case. The way the grievance is handled is that the union decides to take the grievance and file it as a grievance and go through the step one. It's denied by the company within three or four days. Then really not much else happens. There's informal discussions for step two, but nothing's really done at that point. Was there a meeting at step two or is that clear? There was an informal meeting between the representatives of the union and the company. Isn't that all step two requires is an informal meeting? Well, there is an informal meeting, but it really is unclear if there's anything that's actually done on this at that point. The next step would be arbitration. Now, the union does tell Ms. Clowney on several occasions that the matter is proceeding to arbitration and or is in arbitration, which is not correct. They also require her to obtain pay stubs from 2004 that showed she would work as an equipment cleaner. They also wanted her to find the bump form, the layoff form, that indicated that she wanted to work at the time of the layoff. As our brief indicates, the bump form was lost by URS. Rebecca Card was contacted by Ms. Clowney. She's the head of human resources. She writes an email to her supervisor saying, I guess we can tell her that it was misplaced after the course of two years. Supervisor says, don't do that. We don't know if we had it or not. And then nothing really happens at that point except the union keeps trying to get Ms. Clowney to produce these documents. Ms. Clowney does try to produce the documents, but she's unsuccessful. There's nothing for her to get. She can't find pay stubs that are now over 12 years old. And what then becomes the main issue of this case is that when we just deposed Ms. Card, Rebecca Card, she indicates that there's a master list that everybody has. The plant manager has it, the union people have it, and that indicates the jobs that these people work, the date of their hires, and if there was any layoffs. This document was sufficient for all purposes related to this case and would serve as the basis for any of the grievances that were required. Sending her out to get these documents and one, to get a document that she had no access to, the company only had access to, made this an arbitrary act by the union, and it was impossible for her to complete that task. Did she ever request it? She did. She actually filed a formal complaint with the company asking for that material. She had several phone calls with Ms. Card, and what was supposed to happen was there was supposed to be this conference call with Rebecca Card, the plant manager, the union, and it never took place. No one really states why. It just didn't take place. It was scheduled. It didn't take place. And this document has not been found. It has not been found in discovery. It has not been found through the union grievance process. And that forms the basis for the union's decision to not further pursue her grievance. And that is the position that we're taking, that in this case, in reality, there was no need for this document or to make Ms. Clowney try to access this document. The material was accessible in the master list that was available to everybody. Moreover, her union representative worked alongside her and knew that she worked in these capacities. So although he hadn't proved the case, he was aware that this was something that was readily available to both him and other people that had worked at the facility. Did he know that she had worked there before? Yes. Would an affidavit from him have sufficed? Well, we took his deposition, and he had stated that, Your Honor. So I think that's sufficient from that point of view. Secondarily, one of the issues that then develops is that there was a settlement agreement between URS and the union regarding this ET2 cable test that many of the individuals that were displaced received settlement benefits, they received restored seniority, they received training to be able to complete the test. Ms. Clowney wasn't aware of this settlement. She was not put in the settlement. There is no testimony from anybody as to the reason she wasn't put in the settlement. We asked the question. No one really had an answer for us. The settlement, in and of itself, was negotiated by the union. It was signed off by the union. The union selected the people that were supposed to be in the settlement. The individuals in the settlement, the district court had reviewed this and wrote up the opinion in the sense that, well, she wasn't an ET2 at the time. The grievance predated her layoff, so she really didn't qualify. Well, that really is not the issue. The district court looked at this in terms of reviewing the grievance and the decision by the arbitrator. This was a settlement agreement that developed after the grievance and arbitration award came down. The parties decided to enter into a settlement agreement. At the time of the settlement agreement, the awards were generated to individuals far beyond ET2s. Many other crafts received it. The way it was determined who would receive an award was anybody impacted by the ET2 cable test. If they were, they were entitled to this proceed to the settlement agreement. As I stated previously, Ms. Clowney, working as an ET3, tried to bump into an ET2 position. At the ET2 position, at the time she tried to bump, the most senior people had been displaced from the cable shop in the ET2 and were working outside of the cable shop. The company actually initiated a lawsuit in the Middle District of Pennsylvania after the arbitration award, trying to set it aside. In paragraph 10 of that complaint, it states specifically that the 13 individuals that had the most seniority as ET2 workers failed the cable test and then had to work outside of the cable shop as ET2s. That movement and that movement of individuals from the cable shop to the regular ET2 position, because you can be an ET2 and not work in the cable shop and not need to take this test, that movement of these 13 individuals then directly impacts Ms. Clowney. As we stated in our brief, she then becomes similar to anybody else that was impacted by this cable test and received settlement benefits. Metalworkers, painters, anybody, truck drivers, all received benefits under this settlement agreement and for reasons that no one has really articulated, Ms. Clowney has not. The best- Mr. Manolario, you did reserve some time. You're getting quite a bit of overtime, but you did reserve, I think, two minutes for rebuttal? I did, Your Honor. Okay, so why don't we wait and hear back from you then? Thank you. I'll begin with Ms. Kaye. You're leading off for the appellee. Good morning. May it please the Court, Your Honors, and good morning, colleagues. It's been some time. So, Your Honor, as the panel knows, the district court did not get to decide whether or not, didn't reach the point to decide whether or not URS-ACOM had breached the collective bargaining agreement. So, as a result of that, it did decide that the union had not breached its duty of fair representation and so properly dismissed this case. My role here is pretty limited. So, to the extent that I would ask the Court's permission, I would like to address what I believe is a mischaracterization of this master list and also address Ms. Clowney's conduct following her layoff, which I believe is significant to the Court's decision here. The master list is a seniority list. It is not a list of all positions held by all employees at URS-ACOM or with their predecessor contractors. So, prior to URS-ACOM, Ms. Clowney worked for Lockheed Martin and for another company referred to as GS2 and then ACOM. So, the master list is comprised of what ACOM can verify their positions were and then also comprised of information that is gotten from a questionnaire distributed to the employees in which they list their prior positions. So, it does not, without other documentation, verify that the employees actually held those other positions in the other companies. So, I think that's a fairly significant distinction because her list of... Say that again, what you just said. Say that again. The master list can't verify positions that were held by employees prior to ACOM-URS coming on. ACOM-URS had absolutely no access to employee personnel files from the prior contractors. So, they can't verify this. All they can do is ask the employees to list their positions. They include them on the master list, but absent some other documentation, there's no way to verify the So, I think that is a pretty important point here. Does the master list show Ms. Clowney's representation that she previously worked as an equipment cleaner, even if with some other company? It does. Because the questionnaire that is presented to the employees is filled out, that she had been an ET3, an electronic tech 2, and also she had worked as a cleaner, an equipment cleaner. So, she filled out that list, but what I am suggesting and what I think is probably a key here is that the list alone doesn't verify that information. And so, the union asking for additional documentation is, I believe, to be reasonable and I submit that to the court. So, another point, and Mr. Martellotti hit on this earlier in his argument, is that she believes she should have been put into another position, either the ET2 position for which she took the test, or an equipment cleaner position. It is not the company's obligation to put someone into a position. It is the employee's obligation under the collective agreement to notify the company of their intent to be recalled into another skill classification. So, in order to be hired or to be recalled into any position with a client, the individual must submit an application for the position that she seeks. Well, I am not as concerned about that. Maybe I should ask one of your colleagues this question. My concern here is whether or not she was treated the same as everybody else who was similarly situated. And the thing that gives particular rise to that concern is her situation vis-a-vis Keith Labadie. That's why I mentioned it earlier that she was an ET3, lost that position, tried to bump into an ET2 position, failed the test, and was, based upon having failed the test for an ET2, precluded from becoming an ET2, and then that kind of snowballed into where we are today, is my understanding. But my understanding also is that she's not the only one who was an ET3, who tried to go to an ET2 by the bumping process, took the required test for that, and failed it. But that the other, at least one of the person who failed the test, did get the ET2, either the ET2 placement, or was part of the arbitration agreement. And if that's wrong, correct me on that, but if it's not wrong, then why doesn't that preclude summary judgment here? The reason she does not get called back, and I believe Ms. Martin intends to address this in some detail, is because she is not part of that arbitration. She was not named as a grievant for the grievance that precluded the arbitration. She was not part of that, and she was not part of the settlement. And as I'm sure the panel... Well, was that correct, that she was not part of the settlement? Correct. I mean, she was working... But if she wasn't a part of it, why wasn't she a part of the settlement? I mean, if she had bumping rights to go down to the ET2, should she have been pulled in and be made part of that settlement? I don't believe that would have happened, and I believe that whoever was selected to be part of that settlement was selected by the union to be part of that settlement. It was discussed, but as I understand it, it was... Isn't that the basis for her claim against the union, for lack of fair representation? Well, I think the basis of her claim against the union is that she was not brought back into work, and they didn't advocate for... It didn't give her a position, but I do not believe she... Or that she wasn't... And she wasn't made part of the settlement. Correct. And or... It's not... Because she wasn't qualified to be a grievant in that arbitration. I believe that's my understanding, and I do not want to speak for Ms. Martin or for the union, because I will get in a great deal of trouble doing that. I appreciate that. Well, before we hear the term kneecapping, you're not suggesting that the union would kneecap you for doing that, are you? Not a chance, Your Honor. They are honorable people, all of them. I would like to make one... Let's go to Ms. Martin, because you're... Certainly. Time is up. I'm reminded... Thank you, thank you. Sure, good. I'm reminded what was said about Brutus, about being an honorable person, so I'm not sure how much of a compliment that is, so... But you're clearly not Mark Anthony. Ms. Martin? Hi, good morning, Your Honor, or good afternoon, Your Honors. My name is Linda Martin. I represent two of the appellees in this case, the District Lodge 1 and Local 1717. Let me follow up with where we left off with your colleague, Ms. Kay. Why wasn't she part of the And I think maybe the best way to do that is to start with the September 2012 layoff of the ET2s. What happened in September of 2012 was that ET2s were looking to be reassigned, to move over into another ET2 position. But the employer forced them to take the cable test, the cable fabricator test, which these ET2 employees were not looking to. To be an ET2 in that shop, but you're probably... No, they weren't in the shop. Someplace else, okay. These... The September ET2... The September grievance for the ET2s, they were not in the cable shop, okay? They worked outside of the cable shop. As Mr. Martellotti had told you, ET... There's ET2s in the cable shop, and then there's other positions that ET2s hold, okay? So ET2s outside of the cable shop are looking to be reassigned. They're not looking to bump into the cable shop. And the arbitrator, in her decision, is very clear about that. It wasn't a case of bumping. It was a case of trying to be reassigned to another position. And the arbitrator found that because the company required these ET2s who were just looking to be reassigned, and they failed, okay? Okay. So the issue is the CBA explicitly allows testing for bumps, right? But not for reassignments. That's correct. And these ET2s in September 2012 were not trying to bump. They weren't... This was not a bumping issue. And the arbitrator made that really clear. It's a reassignment issue. So these ET2s who failed the cable shop test, they get laid off. Except that some of them had seniority and could bump someone out from a lower classification job, which some of them did. So the people who get bumped out of a job by these ET2s are now out the door. They're laid off. Had the company not violated the contract and made these ET2s who weren't working in the cable shop and were just looking for reassignment take that test, these other lower skilled people would not have been laid off. So this goes to arbitration. The arbitration upholds the union's grievance and she issues an award. But URS challenges that arbitration decision and tries to vacate it. While that's pending before the district court, the union and the employer settle. And there's a remedy amount that people are going to be paid. Some people are going to be allowed to take some courses at a college. When the union was looking at who was going to share in that remedy, they included not only the ET2s who should never have been forced to take the cable test and were laid off, but also the people that they bumped and took out of work. Because, for example, if I was an equipment cleaner that got bumped by one of those ET2 people and I'm out of a job, I shouldn't have bumped. I shouldn't be out of the job because of what the company did, sort of the domino effect. So I think Ms. Clowney misunderstands why ET2s are being recalled. Judge Porter, go ahead. I'm sorry, did I miss something? Yeah, go ahead. Judge Porter wants to ask you a question. Why is it appropriate? Just tell us, why is it appropriate that Ms. Clowney was not included in the settlement class? Because she was not part of the layoff in 2012. And when she was laid off, seven months later, she was not laid off out of seniority and she wasn't bumped from her position. The only reason, Your Honors, that she took the cable fabricator test at the time that she was being laid off was because URS had two vacancies for ET2s in the cable shop and URS wanted to fill those positions. So they gave the ET3s who were being laid off and she wasn't the only one. She was number nine out of 13 ET3s that were being laid off. They were given the opportunity to take the cable fabricator test and bump into the ET2 if they passed the test. She didn't pass that test. That's the difference. How is that different than Labate, than Keith Labate? Why are they not the same? Because Mr. Labate fell into the September 12th grievance class. She does not. But he was put into the class though. Why was he put into the class and she wasn't? Because he was impacted by that September 2012 layoff. Ms. Clammy was not impacted by that 2012 layoff. She's still working, right? She's still working as an ET3 and she continues to work. I will confess I can't recall what I read of that affidavit. Because if he wasn't out of work, then it seems to me that he's the same as Clowney. Well, no, he would not be the same as Clowney because if he was an ET2 in September 2012 and got laid off, he may have come back to work and moved into other positions and maybe worked his way up to ET3. I mean, we don't know his whole history. All you have is this little affidavit that says really not much of anything. This is what happened. But we don't know the whole history. But we're in summary judgment. That's the problem. It says summary judgment with no disputed issues of material fact. It seems to me that there are some. What you're saying may be absolutely correct, but it's a factual determination that was assumed. Am I wrong about that? No, I don't believe it was assumed, Your Honor. I don't believe it was assumed, Your Honor. Because there really is this distinction between her situation and other people's situations. Well, I'm trying to find out what the distinction is, and you're not quite sure. I'm not quite sure. If there is a distinction, whether or not it's a distinction that there's something other than the rise to disparate treatment in terms of who was in and who was out of the settlement agreement. You may be absolutely correct. You may be absolutely correct. I just don't know what I'm not sure that the record is clear. We've got the little affidavit that you talked about, but that little affidavit is sufficient, it would seem to me, perhaps to get past summary judgment. And maybe Mr. Polinsky can help me understand what I'm missing here if I'm just missing something, because I may well be. I miss all kinds of things. The two folks from my colleague can tell you that. I miss things all the time for lifelong Browns fans. I'm a born loser. Your Honor, I think perhaps there's a misfocus on the cable test. She took the cable test not because of the September 2012 situation. She took it because URS needed to fill two vacancies. That's the only reason that that cable fabricator test comes into play. If the employer didn't have those two vacancies, Ms. Clowney would not have been taking the test, right? They were permitted to require that cable test for somebody situated like Ms. Clowney under the CBA. Is that correct? If there were open positions that she wanted to bump down into in the cable shop. She wanted to bump, not reassign, correct? Correct. She wanted to bump, not reassign. And so, you know, I think we get a little lost with this cable fabricator test. And in Ms. Clowney's situation, the only reason that she was offered the opportunity to take the test was because the employer was trying to fill two vacancies in the cable shop for ET2 individuals. Had they not had any openings in the cable shop for ET2s, she wouldn't have been offered the opportunity to take the cable test to bump down into the ET2. She just would have been laid off, which kind of, if I may, takes us to what counsel for the company was saying. And she's correct about the collective bargaining agreement. And I think really the crux of Ms. Clowney's case is that she expected URS to find her a job that she could either be recalled to or bumped into. But the collective bargaining agreement does not say that and doesn't put that responsibility on the company. The collective bargaining agreement under the layoff provision, there's a recall provision. The employer is obligated, if the position becomes open again, to recall Ms. Clowney to the ET3 position. Absolutely, the company is obligated to do that. But the second right that an employee has to recall is to notify the employer that, hey, there's other positions that I've worked and I would also like to be recalled for that. But you've to tell the employer that. And I think Ms. Clowney, not I think, she testified, she filled out that layoff option agreement form and that's all she thought she had to do. But the collective bargaining agreement requires more than that. And with regard to bumping... What does it require? In addition to the form specifically, what does the CBA require? The CBA requires, and it says, it is the responsibility of the employee to notify the employer of the position that they would like to be recalled to. Okay. And didn't she say she did tell someone? I'm sorry. I can't remember his name, but I thought she is saying she did tell someone she wanted to be recalled. No. Well, no. What she... First, I think she thought that because she filled out that layoff form, that that was sufficient. Okay. What she did was during the period of her layoff, the company started to recall equipment cleaners. And her sister was an equipment cleaner. Her sister always worked at URS as an equipment cleaner. So her sister tells her the company's recalling equipment cleaners. Now, Ms. Clowney, at that point, she should have applied to the company saying, hey, I want you to bump someone who you recall to that position because I have more seniority. But she didn't do that. And she admitted at her deposition that she did not do that because she was waiting for URS to call her and because she had about 10 months left for her recall, right? So she didn't do that. At some point, like the end of that year, the end of December and January, she does call the union and say, hey, I heard they called the equipment cleaners back. And they did. And she was told, yeah, they did. And they were filled by people with less seniority for you. But she sat on her rights and she let her recall rights run out. She doesn't ask for a grievance to be filed saying that she was skipped over for the equipment cleaner position until she comes back to work. And even then, you know, she's told you're going to have to do some homework. There's things that the union needs in order to succeed at arbitration, right? Because an arbitrator is going to be looking at that collective bargaining agreement. He's going to see what it says for recall. He's going to see what it says for bumping. He's going to look at that March 13, 2013 memo that the employer gave to everyone that Ms. Clowney signed that said, you've got bumping rights, but you need to check the website, which she admitted she didn't do. So what's the union going to do? They're in front of an arbitrator and saying, hey, she was skipped over. There's no evidence in the record that she contacted URS saying, I want to be recalled to an equipment cleaner position or even an ET position, ET2 position outside of the cable shop. And there's nothing in there saying, you know, I would like to bump. I heard, you know, you're bringing somebody back. I have more seniority than Linda Martin. I want to bump her out of that position. She just waits for somebody from URS to call her. Okay. Hold on. I missed the chat that I got about your time being up, but you haven't been up for a bit. So, but we understand your argument. So let me move to Mr. Bielski. Good afternoon, Your Honor. My name is John Bielski and I represent the Applee International Association of Machinists and Aerospace Workers, which I will refer to as the International. The International, I think it's clear in the briefs, is separate and apart from the District Lodge and the local. They are the sort of mothership over both of them, but they are separate and distinct. And my comments are very limited because, quite frankly, the evidence with respect to my client, the International, is incredibly limited. And based on that, the district judge had every, it was proper for him to grant our motion for summary judgment. And I would respectfully say that part of his judgment should be affirmed by this honorable court. I just want to go through like some very basic things with respect to the evidence that was brought forth by the plaintiff with respect to my client. First, there is no dispute that grievances are handled and processed and settled by the District Lodge and the local, not the International. Two, that Ms. Clowney only had a handful of contacts with agents of the International. She had one conversation with a Bryant, a Brian Bryant, who was then the chief of more conversations with a Jim Smith, who later became chief of staff of the International. Ms. Clowney, in her deposition, testified that Bryant was very kind. She testified that Mr. Smith was a very nice person and was always pleasant. And she further testified that Smith, quote, afforded her a level of comfort and he listened. And she felt like she was being the record that both Mr. Bryant and Mr. Smith referred the matter back to the District Lodge and that neither of them had any other input regarding her seniority grievance or anything else in this matter. That's the evidence with respect to the International. That's it. There is no way in which that evidence could support a claim of a duty of fair representation with respect to the International. They didn't act arbitrarily, discriminatorily, or in bad faith. And there's certainly no, that evidence doesn't support the notion, or was any other evidence brought to bear to support a notion of vicarious liability of common law agency. There's no evidence that the International instigated, supported, ratified, or encouraged any of the purported conduct of either the District Lodge or the local. And therefore, it was perfectly proper for the District Court to grant the International's motion for summary judgment. And I would also suggest that the briefs of the appellant in this matter sort of support that position. In their brief, in their original brief to this Honorable Court, they spend 95%, 99% of their time discussing what happened with respect to District Lodge and the local. They have one paragraph on page 21 referencing the International, what the International did. And it only references what her conversation with Jim Smith. She doesn't mention her conversation with Brian Bryant. And she doesn't mention that she had a favorable view of both of those men and a favorable view of the conversations she had with them. With respect, you know, furthermore, with respect to the reply brief, after, obviously, the International filed their brief, there is no attempt to address the arguments raised by the International as to why, and also raised by the District Court, as to why the International was not liable to her on a duty of fair representation claim. And I would respectively suggest that's because there is no evidence that the International is liable on a duty of fair representation claim, either independently or on a theory of common law agency. Unless your honors have questions, that's my presentation. And I appreciate your time. Okay. Thank you very much. I have none. I'm not sure my colleagues do either. So I want to hear from Mr. Motilati on the rebuttal that he said. Let me ask you, Mr. Motilati, did Labradorian know that he, was he trying to bump down to a position or was he trying to be reassigned to the ET2? Or is it clear? You're muted. I apologize, Your Honor. It's not clear. And I did not have contact with him directly. So I would be remiss of me to make a rebuttal. I'm not sure about, other than what's in the affidavit. What is it? Does the affidavit specify whether he was bumping down or seeking reassignment? It identifies that he had seniority both as an ET2 and ET3. And he was trying to become an ET2, had to take the test and failed it. But that doesn't go to resolve the problem that maybe he didn't have to take the test. He was trying to be reassigned to not bump down. Well, there are some issues that do exist that may help on that. And one of them is this settlement agreement. As part of the settlement agreement, it lists all the individuals that were subject to the settlement agreement. Seven of those people have ET3 seniority rights. And although it's not listed that they took the test, it says there is information that they took the test, failed, and were unsuccessful in bumping. So there are folks that did try to do that and were unsuccessful, and then were part of the settlement agreement. Could someone do both? Did someone ask for reassignment and also bump down and take the test? Oh, sure. I think you can. As long as there's an opening, you can bump. You can use your And that's really getting to it. And I'd like to embrace this as an important part of the case. One of the reasons that taking the test is the red herring, that's because it's part of the collective bargaining agreement. It's being used by the parties here, the unions, to say, well, she had to take the test. That's why this is different. It's not, though, because if you take the arbitration decision, this is paragraph 10, page 622 of the record. The only ET2 positions outside the cable shop were filled with the 13 most senior ET2 employees, all of whom have previously failed the certification test. So the company acknowledges that the most senior people that were working in the cable shop left the cable shop because they all failed the test and became ET2s. That movement then pollutes the ET2 work pool so that when Ms. Clowney is trying to come back to being an ET2, the only thing available to her is the cable shop because the senior people left the cable shop. That clearly indicates how she was impacted by the test. The test moved out the senior ET2s out of the cable shop, put them in the regular ET2 jobs that Ms. Clowney had seniority to hold. They were no longer available to her because of this. And now all that's left is the ET2 cable test. And that's why she can't work as the ET2 cable test. I do want to bring up a couple of other things. Yeah, but let me ask you, counselor, what does that mean in the scope of this argument? It means that she was impacted and shouldn't have been part of the settlement because the you're saying because of that, she should have been put in the settlement. Correct. Even though that the settlement and what concerns me about your argument is I can't get away from the fact that the settlement included only those who were ET2s in September of 2012. That's incorrect. And that's what the district court was incorrect about. Also, the settlement included anybody impacted by the unilateral imposition of the cable test that included ET2s, that included painters, that included equipment cleaners. And in this case, it should have included ET3s like Ms. Clowney. And there are ET3s in the settlement agreement that were impacted just like she was. She is not. Give us a name of one. Mr. Fink is the one person that is in a similar situation that was part of the settlement agreement and Ms. Clowney was not, who was an ET3. Mr. Levati, I'm not. Excuse me. Your brief says that Mr. Fink was an ET3, but there's no record citation on page 18. Can you give us a reference to how you know that he's an ET3? That's based on reviewing the master list, Your Honor, which is part of the record. I don't have. But as of 2012, Mr. Levati, per his affidavit, was an ET2. Well, I don't have his affidavit, Your Honor. I know he was an ET3. His affidavit on point five says during calendar year 2012, while he was working at ET2. Okay. In terms of the settlement agreement and the way counsel has framed this, it's the same the court looked at it. However, the grievance and the date of the grievance is irrelevant. The award of the perpetrator became a settlement. The parties entered into a settlement and took that beyond and the standard was based on the union and who qualified was anybody impacted by the test. Not in 2012. If they were trying to reapply, right? If they were trying to reapply. No, no, Your Honor. Anybody impacted. So, had people that were equipment cleaners. You had people that got bumped from the ET2s that lost their jobs because they failed the cable test. They got moved to different crafts. They lost their jobs. They're part of the settlement agreement. We're saying the same thing. Ms. Clowney had seniority as an ET2. The requirement to take this cable test moved all the senior ET2s out of the cable shop and took away her ability to work in regular ET2 jobs. She was impacted just like the person that the senior people came down and took jobs away from who were ET2s. There's no difference. The court framed it by looking simply at the arbitration agreement and this isn't that. This is a settlement and that really is the most important thing. Also, I do want to mention that counsel was asked did she do anything. She said she called the union. She also called the plant manager, Dan Hopkins, and asked for the end of her two-year period of time. She was told that work was being given out and she didn't get it and there was no reason for that. So, not only did she fill out the forms, which according to the affidavits was sufficient to get people brought back to work. We had four people brought back to different jobs in different job classifications than they held at the time just because they were out there and were called back. She actually called the company, talked to the plant manager, and asked for work. She said I'm willing to do anything. I'll clean the floors. Mr. Lottilotti, one final question at least from me. There's a list that appears at page 882 of the appendix. I'm looking at the list. It has the list of employees' names who were included that purported that they were included in the settlement. Correct. Okay. Can you tell us if there's a place in the index where it shows those on that list were not ET2s and were brought in? Your Honor, documents provided by the company during discovery indicated there were seven people. Bechler, Collins, Fink, Koprinski, Labatai, Matrix, and Mikovic. Where is that in the record? That is not in the record. It's in discovery documents, but that's materials that we have that failed the test and were unsuccessful. Could you send us something post-argument? Sure. Could you provide us a submittal with copy? Sure. The final point I'd like to bring up is that one of the issues that the union actually made an issue during the pendency of this grievance to indicate that the company ... One of the reasons they were having problems moving forward with the grievance is because the company, Dan Hopkins, the plant manager, they indicated to her, offered her a job and that she turned it down, which in fact did not happen. We did depose Mr. Hopkins, and he said that never happened. Again, that goes to the entire issue of the bad faith and the actions of the union. Based on both the manner in which the grievance was handled and then dropped, the information that was given that was incorrect to Ms. Clowney, and her failure to be included in the settlement agreement based on the domino effect that was the standard raised by the union, we believe that there is sufficient evidence to have the district court's decision on summary judgment to be overturned. Thank you very much for your time. We take the matter into advisement.